IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT and RANDALL HERMANN, MD., | ) ) ) | Case No. CV-05-189-E-BLW |
| | ) | **MEMORANDUM DECISION** |
| Plaintiffs, | ) | **AND ORDER** |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FOREST SERVICE, | ) ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## INTRODUCTION

The Court has before it cross-motions for summary judgment and a motion to strike.  The Court heard oral argument on January 23, 2006, and took the motions under advisement.  For the reasons expressed below, the Court will deny the motion to strike, and grant in part and deny in part the cross-motions.

## BACKGROUND

Plaintiff WWP asserts that the Forest Service has failed to do a proper environmental analysis of the impacts of grazing on four allotments within the Sawtooth National Forest (SNF) and the Sawtooth National Recreation Area

**Memorandum Decision and Order – Page 1**

(SNRA).[1]

Congress created the SNRA in 1972 in the Organic Act, 16 U.S.C. § 460aa, *et. seq.,* and charged the Secretary of the Agriculture, and thereby the Forest Service, with the duty of managing the lands.  Congress listed certain "primary" values that it wanted conserved and developed, including scenic, historic, and wildlife values.  *See* 16 U.S.C. § 460aa-1(a).  Congress also directed the Forest Service to manage the utilization of timber, grazing, and mineral resources, so long as that utilization did not "substantially impair" the SNRA's primary values.  *Id.*

For management purposes, the Forest Service has divided the SNF and SNRA into allotments, on which about 4,470 sheep currently graze.  This grazing is conducted pursuant to permits issued by the Forest Service, typically for 10-year periods.  The permits are accompanied by Allotment Management Plans (AMPs) that set forth the terms and conditions governing the grazing.  The AMPs are fine-tuned on an annual basis with Annual Operating Instructions (AOIs).

The AMPs and AOIs must be consistent with the SNF Forest Plan, which governs the overall management of the Forest Service lands within the SNF, including the SNRA.  The Forest Plan sets broad programmatic guidelines, while

---

[1] Two of the allotments are entirely within the SNRA while the other two are partly within its boundaries.

**Memorandum Decision and Order – Page 2**

the AMPs and AOIs set the site-specific guidelines.

In the mid-1990s, Congress found that the Forest Service was not proceeding quickly enough to conduct environmental analyses of the impacts of grazing on the National Forest lands. As a remedy, Congress passed the Rescissions Act in 1995 to compel the Forest Service to set up a schedule to conduct a NEPA analysis on each grazing allotment in the National Forest System. The Forest Service submitted a schedule in 1995.

The Forest Service did not fully comply with its schedule, however. In *WWP v. Sawtooth National Forest*, CV-01-389-E-BLW (June 13, 2002), the Court found that the Forest Service had failed to complete the NEPA analysis on 7 allotments within the SNRA by the dates specified on that schedule. The Court went on to set new deadlines for NEPA analysis, and held that the analysis must include a review under the Organic Act of whether grazing was "substantially impairing" wildlife values. *Id*. at p. 7.

In 2003, the Forest Service revised the SNF Forest Plan. Using that Plan, the Forest Service then issued in September of 2004, the North Sheep Environmental Impact Statement (NSEIS) to study the impacts of sheep and goat grazing on four allotments: (1) Fisher Creek, (2) Smiley Creek, (3) North Fork-Boulder, and (4) Baker Creek.

**Memorandum Decision and Order – Page 3**

Based on a review of the NSEIS, the Forest Service issued two Records of Decision (RODs) on September 30, 2004 – one for the North Fork-Boulder and Baker Creek allotments, and another for the Fisher Creek and Smiley Creek allotments.  The RODs authorized no reduction of grazing in the Fisher Creek and North Fork-Boulder allotments.  Reductions were ordered in the Smiley Creek allotment, from 3,877 to 3,628 head-months, and in the Baker Creek allotment from 6,530 to 5,159 head-months.

The reductions in Smiley Creek and Baker Creek resulted from the closure of certain high-elevation areas, and the closure of the Adams Gulch area in the Baker Creek allotment.  The RODs also moved two sheep corrals and planned mitigation measures including (1) restricting grazing along Smiley Creek, (2) restricting sheep crossings on certain streams, (3) prohibiting sheep bedding in riparian areas or noxious weed infestation areas, (4) posting signs to warn recreationists of sheep and guard dogs, (5) prohibiting fall use of two areas of the "sheep driveway," and (6) coordinating with the Idaho Department of Fish and Game if Bighorn Sheep are sighted in the allotments.  *See NSEIS* at pp. 2-14 to -15.

The RODs also implemented a strategy for future management known as "adaptive management."  The Forest Service defined this as "a strategy based on three principles: (1) achievement of realistic, clearly defined objectives, (2)

**Memorandum Decision and Order – Page 4**

ongoing monitoring to assess progress toward those objectives, and (3) the flexibility to alter management when adequate progress is not being achieved." *See NSEIS* at p. 2-2. This strategy is similar to the Fundamentals of Rangeland Health, used by the BLM to manage grazing on the lands under its stewardship. *See AR* 02232 (Forest Service memo suggesting adoption of approach similar to that used by BLM).

The Forest Service did not define the protocols it would use or describe the monitoring that is the heart of the strategy. In a response to public comment, contained in the NSEIS, the Forest Service explained that a monitoring plan "will be developed and implemented through an iterative process if the Proposed Action is selected." *See NSEIS* at p. F-31.

WWP responded by filing this lawsuit, claiming that the Forest Plan and the NSEIS violate NFMA and NEPA. The Court will consider each argument raised by WWP after setting forth the standard of review.

## ANALYSIS

### 1.    **Standard of Review**

The Court's review of NFMA challenges is governed by the Administrative Procedures Act (APA) because NFMA contains no express provision for judicial review. *See Native Ecosystems Council v. United States*, 418 F.3d 953, 961 (9th

Cir. 2005).  Under the APA, the Court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Although this standard is a "narrow one," the Court is required to "engage in a substantial inquiry[,] . . .  a thorough, probing, in-depth review."  *Native Ecosystems*, 418 F.3d at 961.  To have not acted in an arbitrary and capricious manner, the agency must present a "rational connection between the facts found and the conclusions made."  *Id*.

Agencies are entitled to deference to their interpretation of their own regulations, including Forest Plans.  *Id*.  However, an agency's interpretation "does not control where . . . it is plainly inconsistent with the regulation at issue."  *Id*.  Moreover, an agency's position "that is contrary to the clear language of a Forest Plan is not entitled to deference."  *Id*. at 962.

The Court's review of NEPA challenges is also governed by the APA.  In reviewing the adequacy of an Environmental Impact Statement (EIS) under NEPA, the Court applies the "rule of reason" standard, which "requires a pragmatic judgment whether the EIS's form, content, and preparation foster both informed decision-making and informed public participation."  *Id*. at 961.  The Court must ensure that the agency has taken a "hard look" at the potential environmental consequences of the proposed action.  *Id*.

**Memorandum Decision and Order – Page 6**

2.      **Capability & Suitability**

WWP claims that the Forest Service violated NFMA and NEPA by failing to

apply the Forest Plan findings on "capability" to the NSEIS.  There is no dispute

that NFMA compels the Forest Service to determine, in the Forest Plan, the

capability and suitability of SNF lands for grazing.  There is also no dispute that

the Forest Service did so.  WWP's claim is that the Forest Service ignored those

determinations in the NSEIS.  This means, according to WWP, that the NSEIS

cannot be consistent with the SNF Forest Plan, as required by NFMA, and that the

Forest Service cannot be deemed to have taken a "hard look" at environmental

impacts, as required by NEPA.

NFMA requires that site-specific projects and their environmental analysis

must be "consistent" with the Forest Plan.  *See* 16 U.S.C. § 1604(I); *Neighbors of*

*Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1062 (9th Cir. 2002).  The Forest

Service regulations implementing NFMA require that forest plans determine "the

suitability and potential capability of National Forest System lands for producing

forage for grazing animals and for providing habitat for management indicator

species . . . ."  36 C.F.R. § 219.20.  The term "capability" refers to the potential of

land under study to "produce resources," *i.e.,* sustain grazing.  *See* 36 C.F.R.

§ 219.3.

**Memorandum Decision and Order – Page 7**

In drafting the SNF Forest Plan, the Forest Service completed a capability determination pursuant to these regulations.  According to the Forest Service counsel's description at oral argument, the capability determination process is akin to a series of filters or screens.  The land at issue is sifted through these filters, or, in other words, is evaluated according to a uniform set of predetermined criteria. The criteria filter out (or exclude) lands not capable of sustaining grazing. Whatever lands do not fall within these criteria are deemed capable.

The five capability "filters" or criteria exclude lands that (1) are inaccessible to livestock, (2) will not produce at least 200 pounds of forage per acre, (3) are not within 1.2 miles of water, (4) have unstable, highly erodible soils, or (5) are on steep slopes.  *See AR – P001922*.  These are uniform criteria used by the Forest Service.  *Id.*

To determine whether these criteria exist, the Forest Service used satellite imagery because on-the-ground studies would be too expensive and time-consuming given the SNF's rugged terrain.  *See Diem Declaration* at ¶ 5.  These images were often not detailed enough, however, to pick out some of the five capability criteria.  *Id.*  For example, the images did not reveal whether 200 pounds of forage per acre existed in the lands portrayed.  *Id.*

To work around these limitations, the Forest Service developed a model that

estimated the presence of the five criteria using what could be seen on the satellite images. *Id.* Because rock outcroppings and lakes could be seen on the images, and typically contained little forage, the model excluded those areas. *Id.* The satellite images could also detect vegetation, giving the model a basis to forecast the forage in those areas. *Id.*

The modeling data was in digital form, and has been referred to as Geographic Information Systems (GIS) data. The Forest Service used the GIS data to produce maps that depicted the location of capable and incapable lands. *See Declaration of Diem* at ¶ 6. The Forest Service used these maps to "determine if the model provided an appropriate depiction of capability at a forest-wide and management area scale." *Id.* Once the Forest Service validated its model, "the maps were not retained." *Id.*

The result of this process was a finding that only 25% of the SNF was considered "capable." *See SNF Forest Plan* at p. 3-669. The SNF Forest Plan simply presents this 25% figure in a table, and provides no supporting details. While the five capability criteria are identified in an accompanying Technical Report, *see AR* P001922, neither the Plan nor any referenced document discusses how the Forest Service used the five criteria in this particular case to calculate the 25% figure. Although the Forest Service used the GIS data to create maps

**Memorandum Decision and Order – Page 9**

identifying the capable and incapable lands for its internal use, it did not share the GIS data and maps in the Plan.

When this GIS data is examined for the four allotments at issue here, the capable land drops below 25% for three of the allotments. Only 12% of the Baker Creek allotment contains capable land, and the Smiley Creek and North Fork-Boulder allotments contain only 13% and 15% capable land, respectively. *See Mitchell Declaration* at ¶ 8.

The Forest Service does not quarrel with the accuracy of these allotment-specific percentages, but argues instead that they are not part of the administrative record and hence cannot be considered. While it is true that the allotment-specific percentages are not part of the administrative record, they were calculated using the Forest Service's own GIS data. This is not information that was unavailable to the agency, or that arose only after the agency made its decisions – it is the agency's own data, relied upon by the agency in making the decisions under review here. As such, the information falls within the extra-record exception discussed in *Southwest Center for Biological Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1450 (9th Cir. 1996).

The Forest Service responds that even if the figures are considered, their alarming appearance is exaggerated because they are imprecise and subject to

substantial modification by on-the-ground studies.  For these reasons, the Forest

Service argues that the figures are inappropriate for use in site-specific studies like

the NSEIS.

To support this argument, the Forest Service filed the affidavit of Michael

O'Farrell, a Rangeland Management Specialist with personal knowledge of the

actual conditions in these allotments.  He details instances where the GIS data was

simply wrong, in some instances overestimating capable lands, and in other

instances underestimating them.  *See O'Farrell Declaration* at ¶ 6, pp. 3-5.

Because of these inaccuracies, the Forest Service argues, "the fact that a

forest-level capability analysis may find land to be only partly capable does not

mean that the Forest Service should issue a decision disallowing grazing on that

land, as [WWP] contends."  *See Forest Service Reply Brief* at p. 5.  The Forest

Service insists that it did site-specific studies that supported grazing and provided

more reliable data than the capability determination, and that those studies were

fully discussed in the NSEIS at the following pages:  (1) NS06888 (forage

production and capacity); NS06898 (table of land group, type and soil

characteristics by allotment/unit which specifically shows soil productivity,

fertility, etc.): NS06897-6904 (effects from sheep grazing on soils); NS06999 (soil

productivity); NS07002-7005 (analysis by alternative on soil productivity).  *See*

**Memorandum Decision and Order – Page 11**

*Forest Service Reply Brief* at p. 6.

Site-specific studies done after the capability determination could reveal that actual conditions on the allotments are much different than were portrayed by the model based on satellite images.  In that case, the Forest Service may rely more heavily on the site-specific studies than the capability figures in setting grazing levels for specific allotments.  That would be the appropriate result here if the citations listed above represented site-specific studies – done after the capability figures were calculated – showing that actual conditions varied from those depicted in the model based on satellite images.

That is not the case, however.  Here, the capability figure of 25% is contained in a Technical Report dated July 15, 2003.  *See AR NS02240.*  The citations listed above rely almost entirely on data pre-dating July 15, 2003.  The NSEIS makes no attempt to show that the capability figure is inaccurate.  There is no comparison of that figure with site-specific studies showing actual conditions in the allotments.

The Forest Service concedes as much in the NSEIS.  In a section of the NSEIS labeled "Issues Dropped From Detailed Analysis," the Forest Service states as follows:

One commentator questioned whether the [SNF Forest Plan's] assessments of capability and suitability for grazing are accurate given

**Memorandum Decision and Order – Page 12**

the site-specific characteristics of these allotments.  This issue was not analyzed in detail because, based on the [SNF Forest Plan], it is outside the scope of this EIS.

*See NSEIS* at p. 1-11.[2]

The Forest Service treats the capability determination mandated by NFMA as confined to the Forest Plan.  As the Forest Service prepared the NSEIS focusing on four allotments, it made no attempt to determine if the GIS data it used to make the capability determination accurately depicted the actual conditions in the four allotments.  This violates NFMA and NEPA, according to WWP.

As discussed earlier, NFMA requires (1) that suitability and capability determinations be done at the forest plan level, and that (2) all subsequent site-specific management be "consistent" with the forest plan.  *See* 16 U.S.C. § 1604(I).  In its own Technical Paper explaining the criteria for making suitability and capability determinations, the Forest Service concludes that these determinations made at the forest plan level will "provide prescriptive management direction for project-level analysis and subsequent NEPA decisions . . . ."  *See NS02233.*

This agency position comes from its own regulations implementing NFMA,

---

[2]  The Forest Service goes on to explain in the NSEIS that it did address suitability by closing some areas, and may close some areas in the future "on the basis of adaptive management."  *See NSEIS* at p. 1-11.  However, as explained above, the Forest Service never compared the 25% capability figure with actual conditions of the allotments, and provided no discussion of that 25% figure in the NSEIS.

**Memorandum Decision and Order – Page 13**

which state that "[l]ands so identified [in the forest plan's capability determination] shall be managed in accordance with direction established in forest plans . . . ." *See* 36 C.F.R. § 219.20.  The "lands so identified" are the lands designated capable and incapable in the Forest Service's GIS data.  These "lands so identified" are to be "managed" according to the forest plan, meaning that the capable/incapable designations play a continuing role and cannot be discarded once the forest plan is completed.

The NEPA "hard look" doctrine arrives at the same result.  NEPA imposes procedures designed to force agencies to take a "hard look" at the environmental consequences of a proposed action.  *Earth Island Institute v. United States*, 351 F.3d 1291, 1300 (9th Cir. 2003).  The agency must reveal in the EIS how it conducted its "hard look" – including the crucial data it relied upon and how it analyzed that data – so that the public can make an informed comparison of the alternatives.  *Ecology Center, Inc. v. Austin*, 430 F.3d 1057, 1067 (9th Cir. 2005).

Here, the Forest Service had GIS data showing that only 15% of the North Fork-Boulder allotment contained capable ground, yet that figure was never evaluated in the NSEIS despite the fact that the Proposed Action sought to graze 30% of the allotment.  *See NS07005.*  Likewise, the Forest Service GIS data showing that only 13% of the Smiley Creek allotment contained capable ground

**Memorandum Decision and Order – Page 14**

was never discussed even though the Proposed Action sought to graze 29% of that allotment. *Id.*

This process violated NEPA in three ways. First, the Forest Service never explained in the SNF Forest Plan or the NSEIS how it used its five capability criteria to calculate the 25% capability figure. Second, the Forest Service had GIS data that could be used to show allotment-by-allotment capability but never shared that information in any NFMA or NEPA document. Third, the Forest Service ignored the capability figures in the NSEIS. By not revealing crucial data, and then ignoring it in the NSEIS, the Forest Service violated its duty under NEPA to prepare an EIS that would "foster both informed decision-making and informed public participation." *Native Ecosystems*, 418 F.3d at 960.

While the Court finds violations of NFMA and NEPA, the Court is not holding that the capability figures are determinative. For example, lands identified as incapable are not forever off-limits to grazing. Neither NFMA nor NEPA would compel such a result.

Instead, the figures are a baseline. *See AR P014325* (Forest Service Regional Office memo stating that capability and suitability determinations will provide baseline information for project level review of allotment groups). A baseline is a comparison point, not a mandate. If land is found incapable at the forest plan level,

it may still be grazed if site-specific studies show actual conditions support grazing. Conversely, land found capable may become off-limits if warranted by later site-specific studies.

A baseline is a management tool, acting as a starting point to evaluate site-specific proposals. In this baseline role, the capability figures can no more be ignored than the starting line in a 100-yard dash. This is especially true here where so much land was found incapable, and where that finding was made so close in time to the site-specific NSEIS. Even here, however, these figures did not compel a halt to grazing – they did, however, compel consideration.

If the figures were computed inaccurately, the EIS must explain why. If actual conditions differ, the EIS must explain how. With those explanations, the NSEIS would comply with NFMA's "consistency" command and NEPA's "hard look" requirement. The absence of such explanations here constitutes a violation of both statutes. The Forest Service's contrary interpretation is a misreading of the law and hence entitled to no deference.

### 3.   Capability & Suitability for MIS

Management Indicator Species (MIS) for the SNF include the sage grouse, pileated woodpecker and bull trout. *See FEIS ROD* at p. 8. The Forest Service's NFMA regulations require it to conduct for MIS the same suitability and capability

determination it conducts for grazing. *See* 36 C.F.R. § 219.20.  This regulation also requires that "[l]ands in less than satisfactory condition shall be identified and appropriate action planned for their restoration." *Id.*

The SNF Forest Plan and accompanying FEIS do not make any formal capability and suitability analysis for any of the three MIS species.  The documents do discuss habitat, but at different levels of detail depending on the species.

For example, with regard to sage grouse, the FEIS discusses the drop in sage grouse population, and the concurrent diminishment of habitat. *See FEIS SNF* at p. 3-279.  The FEIS then includes a table, based on satellite imagery, showing the amount of sagebrush canopy cover – important sage grouse habitat – in 15 of the 20 SNF Management Areas. *Id*. at 3-280.  On the basis of that table, the FEIS identifies four Management Areas that have less than 10% canopy cover.  For those four areas, the FEIS states that "no other management-controlled reduction [in canopy cover] should take place in the near term in these areas. *Id*. at p. 3-281.

It is not entirely clear from this discussion whether all SNF lands have been evaluated for sage grouse habitat capability.  Five of the SNF Management Areas are not addressed in the table cited above.  There is no discussion whether sage brush canopy is going to be used as the single proxy for capable habitat.  On a broader scale, there is no discussion of a model for capability, as was done for

grazing.  Because of these insufficiencies, the Forest Service has failed to comply with its regulatory duty to determine capability and suitability for sage grouse habitat.

With regard to the pileated woodpecker, the FEIS discusses its habitat requirements generally, and includes a table showing expected habitat trends across all the acres of the three National Forests in the Ecosystem Group (Boise, Payette, and SNF).  There is no more detailed analysis of pileated woodpecker habitat within the SNF, and thus the Plan and FEIS also fail to satisfy the regulation with regard to this species.

The discussion of bull trout habitat is much more detailed.  The bull trout is a Threatened Species under the Endangered Species Act.  *See FEIS SNF* at p. 3-123. The Forest Service has also designated the bull trout as an MIS "because of extensive past habitat reduction, and the potential for additional habitat modification in the future."  *Id*. at 3-129.

The FEIS exhibits an extensive study of bull trout habitat.  For example, Table SW-8 details the conditions on numerous sections of rivers, rating factors such as water quality, watershed conditions, and flow/hydrology, among others. The findings summarized in the Table are then explained at length.

The FEIS also contains a viability analysis, evaluating how bull trout "may

respond to restoration, conservation, and other management actions" for each of the

Forest Plan alternatives.  *Id*. at 3-172.  Over the next 58 pages, the FEIS identifies

deficiencies in bull trout habitat and discusses improvement strategies.  *Id*. at pp 3-

172 to -230.

In this extensive discussion, the FEIS uses terms such as "functioning

appropriately" or "functioning at risk" to describe the bull trout's habitat conditions.

While the FEIS does not use the terms capable or suitable, the terms that it does use

essentially describe the same thing.  The FEIS also contains an extensive discussion

of necessary habitat improvements.

"An agency's actions [under NFMA] need not be perfect; we may only set

aside decisions that have no basis in fact, and not those with which we disagree."

*Forest Guardians v. United States*, 329 F.3d 1089, 1099 (9th Cir. 2003).  While the

FEIS does not use the terms capable and suitable, it does contain a detailed analysis

of bull trout habitat and improvement strategies.  That is precisely the result

intended by the capability regulation, 36 C.F.R. § 219.20.  The Court therefore finds

that the Forest Service has complied with NFMA with regard to bull trout habitat.

In sum, 36 C.F.R. § 219.20 requires the Forest Service to conduct a capability

and suitability determination for MIS species and, for lands in less than satisfactory

condition, to identify those lands and plan appropriate action for their restoration.

**Memorandum Decision and Order – Page 19**

The SNF Forest Plan and FEIS do not satisfy this duty for the sage grouse and pileated woodpecker but do satisfy it for the bull trout.

**4.      Consistency Between NSEIS and SNF Forest Plan**

WWP argues that past grazing levels on the SNF violated SNF Forest Plan standards, yet the NSEIS and RODs authorized grazing at essentially those same levels.  The NSEIS is therefore not consistent with the Forest Plan, WWP asserts. The Forest Service responds that the NSEIS and RODs did make important changes to grazing management, including the addition of the adaptive management strategy, that will lead to improved range conditions.

There is no doubt that past grazing caused serious problems in the SNF.  The NSEIS found that "the existing grazing system does not comply with the management direction provided" in the SNF Forest Plan.  *See AR NS06825.*  The ROD for the Fisher Creek and Smiley Creek allotments stated that the current condition of the two allotments fail to meet Forest Plan standards, "indicating a need for change in current livestock management practices."  *AR NS07206.*

The NSEIS concluded that if no action was taken to reduce grazing impacts, soil conditions would continue to degrade in sensitive areas, stream sediment levels would increase, and fish habitat would be reduced, among other detrimental effects. The effects of taking no action would result in the violation of SNF Forest Plan

**Memorandum Decision and Order – Page 20**

standards: "Continuation of the current grazing management . . . would fail to comply with the following standards: SWEST01 [requiring management actions to restore water quality], SWST04 [requiring that management actions will not degrade or retard soil, water, riparian, and aquatic desired conditions], and may not be consistent with [three listed Plan Objectives]." *AR NS06879.*

Despite the recognition that change is needed, the RODs made no changes to grazing levels for Fisher Creek and North Fork-Boulder, and approved only a very minor reduction in grazing for the Smiley Creek allotment. The RODs closed no areas to grazing in Fisher Creek and only small areas in Smiley Creek and North Fork-Boulder. *See AR NS06867 to NS06870* (maps of closed areas). Grazing levels in the Baker Creek allotment were more significantly reduced, largely due to the closure of the Adam's Gulch area.

The NSEIS listed four changes that distinguished the Proposed Action from the No Action alternative: (1) implementation of the adaptive management strategy; (2) the closure of Adam's Gulch; (3) the closure of select high-elevation areas; and (4) the use of temporary corrals in two allotments. *AR NS07021.*

At first glance, the latter three changes appear of minor significance. The closure of Adam's Gulch only affects one allotment, and the high-elevation closures affect only a very small amount of land. *See NS06867 – 6870* (maps depicting

closed areas).  Similarly, the use of temporary corrals has only a limited impact.

This means that the first listed change – the adoption of the adaptive

management strategy – is the core change implemented by the Forest Service to

improve range conditions.  And that is precisely what the Forest Service itself said

in the NSEIS:

> How effectively the adaptive management strategy could be implemented would be the key to correcting these impacts [to water quality, stream channel morphology, hydrology, riparian soils, vegetation, and fish and invertebrate diversity] and approaching desired conditions.  Closure of select, high-elevation terrain and erection of temporary corrals would reduce impacts in specific areas.  However, in drainages open to grazing, the impacts outlined above would continue to some degree, dependent on the efficacy of adaptive management.

*AR NS07022.*

Despite the importance placed on the adaptive management strategy to meet

SNF Forest Plan standards and objectives, the strategy itself was not explained in

the NSEIS.  The keystone of the strategy is monitoring, yet the Forest Service stated

in response to public comments on the NSEIS that a monitoring plan "will be

developed and implemented through an iterative process if the Proposed Action is

selected." *See NSEIS* at p. F-31.

The failure to explain the strategy and its protocols in the NSEIS violated

NFMA.  In the NSEIS, the Forest Service was relying heavily on the strategy to

comply with Plan standards and objectives.  Therefore, a full explanation of the

strategy and its protocols is crucial to determining whether the NSEIS is consistent with the Plan, as required by NFMA.  Without that explanation, the Court "cannot tell from the administrative record whether or not the Forest Service complied with the [Plan] standard[s]." *Native Ecosystems*, 418 F.3d at 963.  As *Native Ecosystems* made clear, that lack of explanation constitutes a violation of NFMA and is arbitrary and capricious under the APA.

The adaptive management strategy was likewise crucial to the Forest Service's finding that grazing would not substantially impair the SNRA primary values.  *See AR NS07219.*  That finding is also arbitrary and capricious given that the strategy was to be filled out later.

**5.**     **Bighorn Sheep**

WWP argues that the NSEIS fails to ensure a viable Bighorn Sheep population in violation of NFMA.  Their concern is that sheep transmit diseases to Bighorn Sheep.

As the NSEIS noted, a dramatic decline in Bighorn Sheep in 1991 was "presumed . . . [due to] contact with domestic sheep which resulted in transmission of the *Pasteurella* bacteria."  *See AR NS06982.*  The NSEIS states that the disease kills adults quickly and leads to low disease resistence in new lambs.  *See AR NS07070.*

**Memorandum Decision and Order – Page 23**

The Forest Service found that Bighorn Sheep do not use the four allotments, but have a summer range adjacent to the Fisher Creek allotment, and have used range adjacent to the North Fork-Boulder allotment.  *See AR NS06982.*  To determine the likelihood of contact, the Forest Service studied its own maps of herd ranges, and others provided by the Idaho Department of Fish and Game, to determine if contacts were possible.  *See AR NS07053.*  Ultimately, the Forest Service concluded that "[t]he likelihood of contact between these two species in the noted allotments is low, given the lack of overlapping current and historic range." *See AR NS07071.*

The lethal nature of this disease, and the dramatic die-offs in the past, warrant – and were in fact given – close attention by the Forest Service.  After study, it concluded that sheep/Bighorn Sheep contact, and hence disease transmission, was unlikely.  That decision is entitled to deference and the Court can find nothing in the record that renders it arbitrary and capricious.

**6.      Sheep Driveway & Q Fever**

The Court concludes that the Forest Service did treat the Sheep Driveway as a cumulative issue and has complied with NEPA.  With regard to Q Fever, the NSEIS concludes that "continued sheep grazing on the allotments would not pose a significant risk to public health."  *See AR NS07156-7159.*  That decision is entitled

to deference, and the Court can find nothing in the record warranting setting it aside.  The Court will therefore deny WWP's challenges on these two issues.

**7.    <u>Conclusion</u>**

To summarize:

(1)    The failure of the NSEIS to discuss the capability and suitability determinations violated NFMA and NEPA.

(2)    The failure of the NSEIS to discuss the capability and suitability of the MIS sage grouse and pileated woodpecker violated NFMA.

(3)    The failure of the NSEIS to fully explain the adaptive management strategy and its protocols violated NFMA.

(4)    The Forest Service satisfied NFMA and NEPA in its discussion of Bighorn Sheep, the Sheep Driveway, and Q Fever.

Both sides have filed motions for summary judgment.  The Court will grant in part and deny in part each motion, as set forth above.  For the issues on which WWP prevailed, the appropriate remedies will have to await further briefing – the motions did not cover remedy issues as the parties decided to raise those issues only after resolution of the present motions.  For that reason, this decision does not finally resolve the case.  The Court will direct counsel to stipulate to a briefing schedule on the remaining issues, and submit the schedule to the Court for approval

within twenty days from the date of this decision.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the defendant's motion for summary judgment (Docket No. 25) is GRANTED IN PART AND DENIED IN PART.  It is granted to the extent it seeks a finding that the Forest Service properly resolved issues relating to Bighorn Sheep, the Sheep Driveway, and Q Fever.  It is denied in all other respects.

IT IS FURTHER ORDERED, that the plaintiffs' motion for summary judgment (Docket No. 35) is GRANTED IN PART AND DENIED IN PART.  It is granted to the extent that it seeks a ruling that: (1) The failure of the NSEIS to discuss the capability and suitability determinations violated NFMA and NEPA; (2) The failure of the NSEIS to discuss the capability and suitability of the MIS sage grouse and pileated woodpecker violated NFMA; and (3) The failure of the NSEIS to fully explain the adaptive management strategy and its protocols violated NFMA. It is denied in all other respects.

IT IS FURTHER ORDERED, that the motion to strike (Docket No. 34) is DENIED.

IT IS FURTHER ORDERED, that counsel shall stipulate to a schedule for

remaining briefing and submit the stipulation to the Court for approval within

twenty days from the date of this decision.



DATED:  **February 7, 2006**

B. LYNN WINMILL
Chief Judge
United States District Court