IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT and RANDALL HERMANN, MD., <br><br>　　　　Plaintiffs, <br><br>　v. <br><br> UNITED STATES FOREST SERVICE, <br><br>　　　　Defendant. | Case No. CV-05-189-E-BLW <br><br> **MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it a motion for permanent injunction filed by WWP and motions to remand filed by the Forest Service and Intervenors. The Court heard oral argument on May 26, 2006, and took the motions under advisement. For the reasons expressed below, the Court will (1) grant in part the motion for permanent injunction, banning all grazing along Beaver and Frenchman Creeks in the Smiley Creek allotment for the grazing year 2006; and (2) grant in part the motions to remand and direct the Forest Service to prepare a supplementation to the NSEIS and associated ROD.

**Memorandum Decision and Order – Page 1**

## ANALYSIS

In an earlier decision, the Court found that the Forest Service violated NEPA and NFMA in preparing the North Sheep EIS covering four grazing allotments. In its original motion, WWP sought to enjoin grazing on all four allotments. Since then, however, WWP has narrowed its motion, and now seeks only to enjoin grazing on the Smiley Creek and Baker Creek allotments, and to compel the Forest Service to use sheep collars on the Fisher Creek allotment.

**1.    Legal Standards**

The Court's earlier decision found that the Forest Service violated NEPA and NFMA in preparing the North Sheep EIS by (1) failing to discuss publically the capability and suitability determinations that the Forest Service had used internally; (2) failing to discuss the capability and suitability of the MIS sage grouse and pileated woodpecker; and (3) failing to fully explain the adaptive management strategy and its protocols. As a remedy for these violations, WWP seeks to enjoin all grazing on the Baker Creek and Smiley Creek allotments until the Forest Service has corrected the violations.

An injunction does not automatically issue upon a violation of NEPA or NFMA. *See Amoco Production Company v. Village of Gambell*, 480 U.S. 531, 544-45 (1987) (rejecting lower court holding that "irreparable damage is presumed

**Memorandum Decision and Order – Page 2**

when an agency fails to evaluate thoroughly the environmental impact of a proposed action"). Instead, the Court must (1) determine whether there is irreparable harm, and (2) weigh the equities, giving due regard to the public interest. *See High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 641-42 (9th Cir. 2004).

The first requirement – that of irreparable harm – is established upon a showing that environmental injury is "sufficiently likely," because such injury cannot be remedied by monetary damages. *Id.* "If environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.*

Here, the Forest Service's own findings establish that past grazing has caused environmental injury. The NSEIS found that "the existing grazing system does not comply with the [SNF Forest Plan]." *See AR NS06825.* The Record of Decision for the Smiley Creek allotment stated that the allotment failed to meet Forest Plan standards "indicating a need for change in current livestock management practices." *See AR NS07206.* Moreover, the NSEIS concluded that if no action was taken to reduce grazing impacts, soil conditions would continue to degrade in sensitive areas, stream sediment levels would increase, and fish habitat would be reduced, among other detrimental effects. Further environmental injuries

**Memorandum Decision and Order – Page 3**

are discussed in more detail below.

The Forest Service's own findings detail the environmental injury inflicted on the allotments by grazing. It may take up to a year for the Forest Service to complete the new analysis required by the Court. During that period, the Forest Service is proposing certain corrective measures that it alleges will allow grazing to meet Forest Plan standards. Given the Forest Service's own findings on grazing-induced injury to the allotments, the Forest Service has the burden of showing that environmental injury is not "sufficiently likely" under the grazing authorized for 2006.

**2.      2004 Rider**

The Forest Service and the Intervenors argue that the Court's jurisdiction to issue an injunction was rescinded by Congress in the Fiscal Year 2004 Appropriations Act (2004 Rider). The Court disagrees. That law was designed to prevent grazing permits from lapsing due to Forest Service delays in completed an analysis required by NEPA. This dispute does not relate to delays in completing a NEPA analysis, and nothing in the 2004 Rider revoked the long-standing equitable jurisdiction of this Court to issue injunctions. Repeals by implication are disfavored. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1017 (1984). The Court therefore finds that it has the jurisdiction to consider WWP's motion for

injunction.

3.  **<u>Baker Creek Allotment</u>**

The Court turns first to the Baker Creek allotment. There is no dispute that these are fragile lands, and that much of the allotment is not capable of sustaining grazing. However, the Forest Service has now revised upward its estimate of capable lands on this allotment to 15,929 acres. *See Declaration of Ririe,* ¶ 11, at p. 4.

That is more than twice the figure that was contained in the Forest Plan Model and that was before the Court when it issued its prior decision. *Id.* at ¶ 4, at p. 3. As explained by Warren Ririe, a Rangeland Management Staff Officer for the Sawtooth National Forest, the increased estimate of capability results from on-the-ground studies. *Id.* at ¶ 6, at p. 3. According to Ririe, the Forest Service started its analysis with data that was over two decades old, collected on-site as part of a Range Environmental Analysis (REA). To update this old data, the Forest Service "selected random areas on the allotment for field review." *Id*. They took the original REA aerial photos and compared them with actual current conditions on the allotment, "and verified that capable range units were accurately mapped and that the vegetation types identified in the original analyses were still accurate." *Id.* Using the field-verified REA data, the Forest Service revised its estimate of

**Memorandum Decision and Order – Page 5**

capable lands to the figure of 15,929 acres.

WWP argues that the allotment is incapable of sustaining grazing. In support of this argument, WWP submits the Declaration of John Madden, a retired District Ranger for the Sawtooth National Forest. He testifies that the North Sheep allotments are within a large granite intrusion, spreading over Idaho and Montana, known as the Idaho Batholith, and characterized by steep slopes, erosive soils, and low forage production. He concludes that these lands are generally unsuitable for grazing. *See Declaration of Madden* at ¶ 9.

This same point was made in the North Sheep EIS, and is of concern to the Court. Nevertheless, Madden's allegations are general in nature, while the Forest Service has conducted field studies of the Baker Creek allotment, and is thus operating with much more specific information than Madden.

WWP challenges the Forest Service's new capability figures as based on out-dated criteria that provide a misleading picture of actual conditions. As WWP accurately points out, capability criteria have become more demanding since the REA data was collected over two decades ago. For example, under the old criteria, land was deemed capable if it produced an estimated 50 pounds of dry forage per acre, while the new criteria require 200 pounds. *See Declaration of Ririe* ¶ 7, at p. 7. Other criteria are similarly tougher to satisfy under the new changes. Thus, use

**Memorandum Decision and Order – Page 6**

of the old criteria would forecast much higher estimates of capability than the current criteria.

It is not entirely clear from Ririe's Declaration whether the Forest Service relied on current capability criteria, but it appears that they did.  In his Declaration, Ririe attached two maps – the first, Exhibit A, shows capable lands under Forest Plan estimates (which clearly used current criteria) while Exhibit B shows the vastly greater acreage of capable lands under the field-checked REA data.

The entire point of Ririe's comparison was to show how field-checked REA data (represented in the map labeled Exhibit B) increased the capability estimate since the Forest Plan was prepared.  If Exhibit B was prepared using the old criteria, any comparison of the maps would be beyond worthless and approach a fraud on the Court.  Government counsel, Deborah Ferguson, assured the Court, however, that the Forest Service did use the new criteria in preparing the capability estimate portrayed in Exhibit B.

In addition to verifying that more ground is capable of sustaining grazing, the Forest Service is reducing grazing by 45% on this allotment for 2006.  Kurt Nelson, the District Ranger, stated that the allotment was inspected 16 times in the 2005 grazing season. *See Declaration of Nelson* at ¶ 13, p. 4.  Where the inspections revealed over-grazing, those areas were deemed off-limits to grazing in

**Memorandum Decision and Order – Page 7**

2006. *Id*. Other areas were under-utilized, with inspections showing about 25% utilization, well-under the Forest Plan standard of 50%. *Id*.

Sites were established to monitor nesting, ground cover, and riparian conditions. *Id*. at ¶ 15-16, p. 5. District Ranger Nelson concluded that the 2006 and 2007 Annual Operating Instructions (AOIs) for Baker Creek will authorize grazing at a level that is sustainable and meets the Forest Plan direction. *Id*. at ¶ 11, p. 4.

The Declarations of Ririe and Nelson show that (1) the Forest Service has now done a field verification that was lacking when the Court issued its earlier decision, (2) that verification shows improvement of some conditions on the allotment, (3) more land is capable of sustaining grazing than thought previously, (4) grazing will be reduced 45% in 2006, and (5) allotment conditions will be monitored throughout the 2006 grazing season. As discussed above, the Forest Service has the burden of showing that environmental injury is not sufficiently likely under the grazing proposed for this allotment. The Court will therefore deny WWP's motion to enjoin grazing on the Baker Creek allotment.

**4.    Smiley Creek Allotment**

This allotment presents more difficult challenges. This allotment has a number of streams with sensitive fish species and a history of grazing-induced

**Memorandum Decision and Order – Page 8**

problems. The Forest Service is authorizing grazing along almost the entire length of these two streams, despite the fact that past grazing has seriously degraded the riparian conditions and habitat of several sensitive species of fish.

For example, the NSEIS stated that "[r]eview of the baseline fisheries habitat conditions for the Smiley Creek allotment indicates that over a third of the condition indicators are functioning at risk, and another third are functioning at unacceptable risk." *See NS06881*. During the 2006 grazing season, the Forest Service plans to graze sheep along almost the entire 10 mile length of Beaver Creek and the 7.5 miles of Frenchman Creek, both lying within the Smiley Creek allotment. The NSEIS shows that 44% of Beaver Creek is "functioning at unacceptable risk" while another 38% of the creek is "functioning at risk." *See NS06928*. Thus, over 80% of Beaver Creek is not "functioning appropriately." *Id*. Frenchman Creek is in a similar condition: 82% of Frenchman Creek is not "functioning appropriately."

This poor condition becomes especially troubling because both creeks contain Chinook Salmon, Bull Trout, and Steelhead Trout, species of fish that the NSEIS notes are listed as Threatened Species under the Endangered Species Act. *See Table 3-10 at NS06923, NS06922*. Moreover, both Creeks have stream channel characteristics that place them "at greatest risk of damage from livestock

**Memorandum Decision and Order – Page 9**

grazing." *See NS02234, Table 3-12 at NS06924.*

The NSEIS goes on to state that "sediment loads are generally considered to be the most problematic indicator of watershed health in many of the drainages and subdrainages in the project area." *See NS06880.* Sediment conditions "are considered to be functioning at risk or at unacceptable risk in many drainages within the Smiley Creek . . . allotment[]." *Id.* While part of this sediment load comes naturally from the granite material in the soil, grazing "is contributing to sediment production through surface disturbance and may be inhibiting recovery from historic impacts." *Id.*

Given these past problems, the Forest Service has the burden of showing why it is "sufficiently likely" that more grazing will not add to the degradation along Beaver and Frenchman Creeks. Sara Baldwin, the Area Ranger for the SNRA, responds that the restrictions on grazing contained in the 2006 and 2007 AOIs "will allow for management of grazing on the Smiley Creek . . . allotment[] to be consistent with the Forest Plan and avoid the resource degradation from past grazing that was identified in the [Record of Decision]." *See Declaration of Baldwin*, ¶ 10 at p. 3.

Baldwin supports her conclusion with a Monitoring Report that measured grazing use and riparian conditions at four Designated Monitoring Areas (DMAs)

**Memorandum Decision and Order – Page 10**

on August 9 and 10, 2005.  Based on the Report's discussion of the DMAs, Baldwin concludes that "'[t]he corrected monitoring results demonstrate that riparian conditions in Smiley Creek allotment are improving and are consistent with the direction it the Forest Plan." *See Declaration of Baldwin* at ¶ 14, p. 5.

However, only one of those DMAs was on the 7.5 mile length of Frenchman Creek, and there was no DMA along the 10 miles of Beaver Creek.[1]  Thus, the Monitoring Report tells the Court almost nothing about the riparian conditions along Beaver and Frenchman Creeks.[2]

Certainly broad conclusions are properly made from small, statistically-valid, samples.  Here, however, there is a lack of even a small sample on Beaver Creek.  The single DMA on Frenchman Creek cannot be used to support a conclusion about riparian conditions along its entire 7.5 mile length.  Moreover, the monitoring that was done did not evaluate water quality issues such as sediment levels and fisheries habitat.  Many of the serious problems identified in the NSEIS, and discussed above, are not addressed at all in the Monitoring Report.

The 2006 AOIs do not appear to rectify these concerns.  While grazing was

---

[1] The other 3 DMAs were along Smiley Creek and Vat Creek.

[2] The Monitoring Report does note sites along Beaver Creek and Frenchman Creek where plant cover and Aspen growth was monitored.  Those results are discussed at the end of the Report in a few short paragraphs, saying nothing about water quality or fisheries habitat.

**Memorandum Decision and Order – Page 11**

reduced on Baker Creek by 45%, it was reduced by only 9% here. The AOI does provide for spot checks by SNRA Range Staff, and restricts grazing on Frenchman Creek after August 1st, or after the appearance of salmon, whichever occurs first. *See 2006 AOI* at p. 5. However, there is little else to prevent the degradation seen in the past, especially given the fact that proposed usage remains close to prior levels. The bottom line is that sheep will be grazing nearly the entire length of two creeks containing sensitive species of fish and fish habitat adversely affected by past grazing.

Under all these circumstances, the Forest Service has not carried its burden of showing that environmental injury is not "sufficiently likely" to riparian conditions, water quality, and fish habitat on Beaver and Frenchman Creeks. This environmental injury is irreparable under *High Sierra* because it cannot be remedied by monetary damages. Indeed, even if the burden is on WWP to show irreparable injury, they have satisfied that burden.

This is not the end of the inquiry, however. Under *High Sierra*, the Court must weigh the equities of enjoining all grazing along those two creeks. For the purpose of this weighing process, the Court will assume that it is enjoining grazing across the entire allotment, although, as discussed below, the scope of the actual injunction will be limited to the two creeks.

**Memorandum Decision and Order – Page 12**

There is no doubt that the permit holder, Faulkner Land and livestock Co., Inc., will suffer financially from the injunction. This economic injury must be weighed against the environmental injuries discussed above. What tips the balance here is the presence of sensitive species of fish, and the substantial degradation of fish habitat and riparian conditions caused by grazing and documented at length in the NSEIS.

After weighing the equities, the Court concludes that it will enjoin all grazing in the Smiley Creek allotment along Beaver and Frenchman Creeks. WWP's motion for injunction will be granted to that extent and denied in all other respects.[3]

**5.    Scope of the Injunction**

WWP seeks a permanent injunction. The Court declines that request, and will limit its injunction to the grazing year 2006. Before the start of grazing in 2007, the Forest Service should have completed its supplemental NSEIS and ROD, and the deficiencies previously identified by the Court should be cured. If not, WWP is free to challenge the Forest Service once again.

WWP seeks to enjoin all grazing in the allotment. Now that the Court has banned grazing along the two creeks, affecting nearly half of the proposed sheep

---

[3] The Court rejects WWP's request to place GPS collars on sheep.

**Memorandum Decision and Order – Page 13**

trail for 2006, the entire plan for grazing the allotment is now unclear.  If the Government proposes a new trailing plan for 2006, WWP is free to challenge that plan here.  However, the Court cannot enjoin such a plan in advance.  The Court will direct the Forest Service to give WWP immediate notice of any such revised plan.

The Court would urge counsel to work together to craft a plan.  The issues have been substantially narrowed – only the Smiley Creek allotment is at issue, and only the 2006 grazing year is affected.  Counsel may be able to work out an agreement on a new plan.

**6.    Motions to Remand**

The Forest Service seeks a remand of the NSEIS without a "reversal" of that document.  The Court agrees.  Much of what is contained in the NSEIS is unaffected by the Court's decisions in this case.  Primarily, the Court is directing the Forest Service to do more study in specific areas, and to include more information for public comment.  That does not require a wholesale reversal of the existing NSEIS but merely supplementation.  The Court understands that the Forest Service has already began collecting the data to supplement the NSEIS, and intends to issue a new ROD at the conclusion of the supplementation process.  The Court approves that procedure.

**Memorandum Decision and Order – Page 14**

**ORDER**

In accordance with the terms of the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for permanent injunction (Docket No. 52) is GRANTED IN PART AND DENIED IN PART. It is granted to the extent it seeks to enjoin all grazing along Beaver and Frenchman Creeks in the Smiley Creek allotment for the year 2006. It is denied in all other respects.

IT IS FURTHER ORDERED, that the motions to remand (Docket Nos. 57, 60 and 61) are GRANTED IN PART AND DENIED IN PART. They are granted to the extent they request the Court to direct the Forest Service to prepare a supplementation to the NSEIS and prepare an associated ROD. They are denied in all other respects.

IT IS FURTHER ORDERED, that if the Forest Service intends to allow grazing in the Smiley Creek allotment for 2006, that the Forest Service give notice to WWP of its proposed plan immediately once that plan is available.

DATED: **June 12, 2006**

B. LYNN WINMILL
Chief Judge
United States District Court

**Memorandum Decision and Order – Page 15**